UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    08 CR 1003 |
| vs. | ) | |
| | ) | Judge John W. Darrah |
| CHRISTOPHER KELLER | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO
DEFENDANT'S POSITION PAPER AS TO SENTENCING FACTORS**

## I.    INTRODUCTION

On February 22, 2010, a jury convicted defendant of willfully failing to file his tax returns for the years 2004 and 2005. Further, as determined by the Probation Office in the Presentence Investigation Report (the "PSR"), the preponderance of the evidence establishes that defendant aided and assisted and the preparation and presentation of his false and fraudulent 2003 tax return.

Compounding defendant's offense and relevant conduct is the fact that, at trial, defendant: (a) falsely testified about a number of topics related to his offense and relevant conduct; and (b) has refused to accept responsibility for what he has done, notwithstanding his claims to the contrary. Defendant has continually falsely contended that: (a) his failure to file his 2004 tax return resulted from negligence; (b) his failure to file his 2005 tax return resulted from his inability to communicate with BCI Aircraft Leasing, Inc. ("BCI"); and (c) he did not aid and assist the preparation and presentation of his 2003 tax return. Defendant's false trial testimony subjects him to a 2-level increase in his offense level pursuant to Guideline § 3C1.1. Similarly, defendant's false trial testimony and continued insistence on his false version of events demonstrates that defendant has not accepted responsibility for his criminal conduct.

Defendant's willingness to give false sworn testimony is especially egregious given the fact that defendant is an attorney.

Further proof that defendant has not accepted responsibility for his conduct is the fact that defendant has made no attempt to satisfy the tax obligations for which he has been convicted. Rather than demonstrating to this Court that he is serious about his responsibility to pay his tax obligations, defendant instead demonstrates that he is serious about making excuses for why he has not paid the tax obligations. Clearly, defendant wants to have his cake and eat it too – *i.e*, defendant wants to claim that he has accepted responsibility for his conduct without taking any steps to demonstrate such acceptance.

Based on defendant's offense and relevant conduct, as well as his false testimony at trial, this Court should determine defendant's offense level to be 20, which includes a 2-level increase, pursuant to Guideline § 3C1.1, for obstruction of justice. Combining defendant's offense level of 20 with his criminal history category of I, results in a Guidelines range of 33-41 months' imprisonment. The maximum sentence that this Court can impose based on defendant's offenses of conviction is 24 months' imprisonment. The government respectfully submits that a sentence of 24 months' imprisonment is the proper sentence to impose in this case. Such a sentence accords with the factors set forth in 18 U.S.C. § 3553(a).

## II.   FACTS

The government presented its evidence of defendant's offense and relevant conduct at trial. Moreover, the government summarized its evidence in, and attached numerous exhibits to, the "Government's Version of the Offense," (the "Government's Version"), which is attached to the PSR. As such, the government does not restate its evidence or reattach its trial exhibits here. Rather, the government simply provides an overview of the facts.

2

A.    **Defendant Willfully Failed to File Tax Returns for the Years 2004 and 2005 (Counts Two and Three).**

A jury convicted defendant of willfully failing to file a tax return for calendar years 2004 and 2005. In 2004 and 2005, BCI Aircraft Leasing, Inc. ("BCI") paid commissions to defendant totaling $168,700 and $376,896, respectively. Defendant did not file a tax return for the years 2004 or 2005 and did not make, and has not made, any payments towards his tax obligations for those years, despite having available funds to do so. At trial, IRS Revenue Agent Paul Ponzo testified that he computed defendant's tax obligations for the years 2004 and 2005. Defendant did not present any witnesses to contest Agent Ponzo's computations. Agent Ponzo determined that defendant's tax obligations for the years 2004 and 2005 were $56,800 and $131,978, respectively.

B.    **Defendant Aided and Assisted the Preparation and Presentation of a False and Fraudulent Tax Return for Calendar Year 2003 (Relevant Conduct).**

As set forth in the PSR, the preponderance of the evidence establishes that defendant aided and assisted the preparation and presentation of his false and fraudulent 2003 tax return. PSR at 7:140-42. In 2003, BCI paid defendant commissions totaling approximately $187,019. The full amount of defendant's 2003 commissions were not reported on defendant's filed 2003 tax return. Rather, defendant's filed 2003 tax return under-reported the income defendant earned from BCI by approximately $62,500, claiming that he only earned $124,519.

Evidence that defendant aided and assisted with the preparation and presentation of his false and fraudulent 2003 tax return included:

- Defendant filed a signed request for an extension of time to file his 2003 tax return;

3

- Defendant knew his income in 2003 was greater than $124,519, as evidenced by a credit application filled out in connection with the purchase of a Mercedes Benz in which defendant represented that his income was $198,000 per year.

- Defendant paid for the tax obligations on his false 2003 tax return, which obligations exceeded $20,000, with a personal check drawn on defendant's bank account. Defendant also paid the tax penalties and interest due and owing for the year 2003.

- Defendant testified that he reviewed a draft of his 2003 tax return and informed the preparer that the income seemed high.

- Defendant did not make any estimated tax payments during 2003.

- Defendant willfully failed to file tax returns for the years 2004 and 2005.

- Defendant had an agreement with Brian Hollnagel – BCI's owner – wherein Hollnagel agreed that BCI would not report defendant's earnings to the IRS.

### III.   GUIDELINE ISSUES

**A.**   **The Probation Office Properly Determined that Defendant's Aid and Assistance in Preparing His False and Fraudulent 2003 Tax Return Constitutes Relevant Conduct.**

Defendant objects to the Probation Office's determination that: (a) defendant aided and assisted the preparation and presentation of his false and fraudulent 2003 tax return; and (b) defendant's actions constituted relevant conduct. Position Paper at 1-2. This Court should overrule the objection.

As set forth above and in the Government's Version, the preponderance of the evidence establishes that defendant aided and assisted the preparation and presentation of the tax return at issue. The facts to which the defendant points in the Position Paper do not change this conclusion.

4

For instance, whether BCI timely filed Forms 1099 or W-2 for other persons who worked at BCI, has no bearing on defendant's conduct with respect to his 2003 tax return. Similarly, the fact that the income shown on the 2005 Form 1099 that defendant received from BCI was higher than the income determined by Agent Ponzo has no bearing on defendant's 2003 conduct. Defendant seemingly is attempting to show that BCI's books and records were not accurate. However, with respect to defendant, there was no evidence that the records were inaccurate. Agent Ponzo testified that the difference between his computation and the Form 1099 was that the Form 1099 contained reimbursable expenses. Agent Ponzo testified that he was able to determine the amount of reimbursable expenses contained on the Form 1099 by looking at a printout of BCI's accounting records recovered from *defendant's desk* during a search of BCI. As such, not only were BCI's records as to defendant accurate, but defendant had access to those records.[1]

Defendant also points to the fact that he filed for an extension in each of the years 2003, 2004 and 2005. *Id.* at 2. It is unclear why defendant points to this fact in support of his claim that he did not aid and assist in the preparation of his 2003 tax return. However, the government notes that 2003 was the only year in which defendant signed a form seeking the extension. The form was signed under penalties of perjury, and defendant represented that he needed more time to gather the necessary information to prepare an accurate tax return.

Defendant's testimony also failed to establish that defendant did not aid and assist the preparation of his false and fraudulent 2003 tax return. At trial, defendant provided incredible

---

[1]Defendant repeatedly points to the fact that defendant's 2005 Form 1099 showed payments totaling approximately $394,000, while Agent Ponzo calculated defendant's 2005 income to be $370,896. Based on the difference, defendant concludes that: (a) he did not aid and assist the preparation of his 2003 tax return; and (b) defendant was unable to file a tax return for the years 2004 and 2005. Defendant's conclusions are specious. Not included in Agent Ponzo's calculation were reimbursable expenses paid by BCI.

testimony regarding the preparation of his 2003 tax return. Defendant testified that he asked BCI's controller, Jeff Meyer, to prepare his 2003 tax return. Dkt. No. 112 at 119-20. Defendant further testified that he provided Meyer with documents to assist with the preparation. *Id.* According to defendant, Meyer later told defendant what Meyer had determined defendant's 2003 income to be. *Id.* at 122. Defendant told Meyer that he thought the income amount sounded high, but he, nevertheless, provided Meyer with a blank check, with which to pay defendant's taxes. *Id.* at 122-23. According to defendant, after that conversation, he never again spoke to Meyer about the tax return or saw the return before it was filed. *Id.* at 129.

Defendant's testimony about never again speaking to Meyer about the tax return cannot be believed. Defendant worked in the same office as Meyer and, actually, sat right next Meyer. *Id.* at 126-28. Further, defendant admitted that he frequently saw Meyer at work and even had conversations with Meyer about another tax return. *Id.* at 130-33. Moreover, defendant claims that he specifically told Meyer that the income figure on the version of the tax return that defendant saw seemed high. Yet, according to defendant, he never followed up with Meyer. Rather, according to defendant, he simply gave Meyer a blank check. According to defendant, even after the check ultimately cleared his bank account for an amount in excess of $20,000, defendant still did not talk to Meyer about the tax return. Defendant's testimony is the epitome of self-serving.

Significantly, even if defendant's testimony were to be believed, even though it should not, it merely demonstrates that defendant stuck his head in the sand – *i.e.,* defendant was an ostrich. Knowing that defendant directed Meyer to under-report his income and that Meyer would follow defendant's directions, defendant never raised the subject of his tax return again because he knew what had been done.

6

**B.    The Probation Office Properly Calculated the Tax Loss in this Case.**

Defendant objects to the tax loss amounts for the years 2004 and 2005, claiming that Agent Ponzo's computations do not account for expense deductions that "defendant may have" for each tax year. Position Paper at 2. Defendant also contends that the tax loss should merely be 20% of defendant's gross income in 2004 and 2005. *Id.* at 3. This Court should overrule defendant's objection.

As a threshold matter, contrary to defendant's contention, Guideline § 2T1.1 does not provide that, in failure to file cases, tax loss must be 20% of the defendant's gross income. Guideline § 2T1.1(c)(2) provides that if a tax offense "involved failure to file a tax return, the tax loss is the amount of tax that the taxpayer owed and did not pay." USSG § 2T1.1(c)(2). Note A to § 2T1.1(c)(2) further provides that "the tax loss shall be treated as equal to 20% of the gross income . . . less any tax withheld or otherwise paid, *unless a more accurate determination of the tax loss can be made.*" *Id.* (emphasis added). Defendant omitted the emphasized portion of Note A from his Position Paper.

Here, Agent Ponzo's computations constitute a more accurate determination of the tax loss. *See* Government Exhibit 1. Agent Ponzo calculated defendant's unreported BCI income. Agent Ponzo then made a variety of adjustments to defendant's unreported income, which had a net effect of reducing defendant's income in both 2004 and 2005. Included in the adjustments was a deduction for a capital loss that defendant allegedly incurred in 2002. While Agent Ponzo was unable to verify the capital loss, he, nevertheless, gave defendant the benefit of the doubt and carried the capital loss over to 2004 and 2005. After making the appropriate adjustments to defendant's unreported income, Agent Ponzo determined the actual tax due and owing, as opposed to estimating it.

7

Defendant does not make any credible challenge to Agent Ponzo's computations. Rather, defendant merely makes the self-serving contention that the computations do not include expense adjustments that "defendant may have." Position Paper at 2. The government notes that for 2005, Agent Ponzo reduced the amount of defendant's income to reflect expense reimbursements paid by BCI. In that regard, Agent Ponzo credited defendant for his expenses. Further, given that BCI reimbursed defendant for his expenses, defendant would have no deductible expenses for 2005. The same would be true for 2004.

Significantly, defendant presented a defense in this case, that included his own testimony. At no time, did defendant describe and/or substantiate a single expense that Agent Ponzo should have included in his computations. While defendant maintains that he may have expenses, he has had at least five years to determine those expenses. To date, he has not come up with any.

**C.      This Court Should Increase Defendant's Offense Level by Two Levels Pursuant to Guideline § 3C1.1.**

The Probation Office has not taken a position on the application of Guideline § 3C1.1 because the probation officer was not present at the trial. PSR at 7:164-67. However, the facts proven at trial and the jury's verdict establish that defendant falsely testified at trial. As a result, this Court should increase defendant's offense level by 2 levels pursuant to Guideline § 3C1.1.

Guideline § 3C1.1 provides, in relevant part, that:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct . . . increase the offense level by **2** levels.

8

USSG § 3C1.1 (Nov. 2009). Application Note 4 provides examples of the types of conduct that fall within § 3C1.1. Included within the examples are "committing perjury." USSG § 3C1.1 (n.4(b)).

Here, defendant committed perjury during his testimony at trial. Notably, in the Position Paper and Defendant's Version of the Offense ("Defendant's Version"), which is attached to the PSR, defendant continues to take the same false positions that he testified to at trial.

### 1.   Defendant Testified Falsely Regarding His 2004 Tax Return.

Both at trial, and in Defendant's Version, defendant falsely contended that his failure to file a tax return for 2004 was the result of negligence. Specifically, defendant falsely testified that he was under the mistaken belief that he had filed his 2004 tax return until he learned in 2007 that the return had not been filed. Dkt. No. 112 at 27-29; *see also* Defendant's Version at 1-2, 4 (defendant asked BCI's controller to prepare and file defendant's 2004 tax return and failed to follow-up to make sure that it had been filed; defendant mistakenly believed that the payment for his 2003 taxes actually was for his 2004 taxes). Defendant's claim of negligence was false, as evidenced by the jury's verdict on Count Two – which found defendant guilty of willfully failing to file his 2004 tax return.

Indeed, other than defendant's self-serving false testimony that he mistakenly believed that he had filed his 2004 tax return, there is no evidence to support the claim of negligence. Rather, the overwhelming evidence established that defendant acted willfully in not filing his 2004 tax return. For instance: (a) defendant did not pay estimated taxes in 2004; (b) defendant did not file a tax return for 2004; (c) pursuant to an agreement with defendant, BCI did not report payments made to defendant in 2004; (d) defendant did not pay estimated taxes in 2005; (e) defendant did not file a tax return for 2005; (f) defendant knew he was required to file tax

9

returns, but did not do so; (f) defendant still has not filed tax returns for the years 2004 and 2005, nor made any payments toward his tax obligations for those years; and (g) defendant aided and assisted the preparation of his false and fraudulent 2003 tax return.

At trial, defendant testified that his belief that his 2004 tax return had been filed arose from the fact that his payment for his 2003 taxes did not clear his bank account until February 2005. Dkt No. 112 at 27-28. Defendant's testimony does not withstand scrutiny. According to defendant, he provided BCI's controller with a blank check for his 2003 taxes in late 2004 and a blank check for his 2004 taxes sometime after that. However, according to defendant, only one check ever cleared his bank account. According to defendant, he did not bother to see which check cleared and what it was for. *Id.* at 139-41. Defendant could have easily looked into this. Defendant sat right next to Meyer. Defendant also could have simply looked at the check and seen that it was the check he provided to Meyer for his 2003 taxes. To believe defendant's version of events, one has to believe that defendant did not take these simple steps to determine why a check for over $20,000 had been written from his bank account.

A further hole in defendant's story is the fact that in or about July 2005, he received a penalty notice from the IRS indicating that defendant owed an additional amount of approximately $800 on his 2003 tax obligations. *Id.* at 148-49. Defendant wrote a check for the penalty and, on the check, wrote that it applied to the 2003 tax year. *Id.* Defendant's conduct evidences that he knew that the check that cleared in February 2005 check applied to his 2003 taxes, not his 2004 taxes. Defendant would not have owed such a small amount to the IRS for the 2003 tax year if he had not yet paid his primary tax obligations for that year.

The conclusion that defendant knew that the check that cleared in February 2005 was for his 2003 taxes is further corroborated by the fact that defendant sought an extension to file his

10

2004 taxes that extended the filing date past February 2005. *Id.* at 141. If defendant had already filed and paid his 2004 tax obligations in February 2005, no such extension would have been needed.

At trial, defendant contended that BCI's controller sought the extension without defendant's knowledge. *Id.* However, that testimony was self-serving and uncorroborated. Moreover, in the Position Paper, defendant now embraces the extension for his 2004 tax return as affirmative evidence that defendant did not aid and assist the preparation and presentation of his 2003 tax return. Position Paper at 2. Defendant's shifting positions based on what is convenient at the time demonstrates that his self-serving testimony cannot be relied upon.

## 2. Defendant Testified Falsely Regarding His 2005 Tax Return.

Defendant's testimony with respect to his 2005 tax return also was false. Defendant falsely claimed that he did not file a tax return for that year because: (a) he did not have an accurate Form 1099 from BCI; and (b) was not allowed to speak with anyone at BCI to get the situation corrected. *Id.* at 39-40, 42-44. Defendant's testimony was false, and the jury rejected it.

In trying to explain why defendant did not file his 2005 tax return, defendant made various false statements. *Id.* at 39-44. For instance, defendant testified that after receiving a Form 1099 from BCI in late 2006, he gave it back to BCI because defendant believed the income shown on the Form 1099 seemed high. *Id.* at 39. Defendant testified that he never received another version of the Form 1099, claiming that his fractured relationship with BCI (defendant claimed to have left BCI on bad terms), among other things, resulted in he and BCI not communicating. *Id.* at 40-43.

11

To bolster defendant's story of a fractured relationship, defendant testified that at the same time that he was having the 1099 issue, BCI also owed defendant money. *Id.* at 37-38, 40-44. Defendant testified that as a result of the money issue, defendant left his position at BCI. *Id.* at 40-41. When asked why defendant had not sued BCI for his money, defendant testified that, after BCI's offices were searched by federal agents in April 2007, "Brian [Hollnagel – BCI's owner] went completely underground, and *I couldn't get anything out of him.*" *Id.* at 42 (emphasis added). Defendant later reiterated this point, testifying "[Hollnagel] wasn't going to give me Kleenex if I – you know, he wasn't going to give me anything." *Id.* at 43. Defendant's testimony was important to defendant's claim that he was unable to receive a new Form 1099 from BCI.

On cross examination, the government brought out that defendant's testimony was false. Specifically, defendant admitted that after he left BCI, he did have contact with BCI and, in fact, had received a substantial payment from BCI:

> Q: Mr. Keller, the truth is, BCI paid you $50,000 in April of 2007?
>
> A: Yes. Mr. Hollnagel gave me a check in April of – I'm sorry? April?
>
> Q: April of 2007.
>
> A: Yes, correct, April of 2007, when I went to pick my furniture up.
>
> Q: Okay. So there was a payment after you left?
>
> A: Oh, correct.
>
>              \*     \*     \*
>
> Q: You did not tell the jury about that $50,000 payment yesterday?
>
> A: Okay. I'm telling them now.
>
>              \*     \*     \*

12

> Q:   And just three weeks, or two weeks later, after federal agents are at BCI and at your offices, you get a $50,000 check from Brian Hollnagel?
>
> A:   That's correct.
>
> Q:   That you didn't tell the jury about yesterday?
>
> A:   Correct.

*Id.* at 84-87. Defendant further admitted to receiving $8,900 of additional payments from BCI in 2005, for a total of $58,900. *Id.* at 87.

In addition to lying about his inability to get any money out of BCI, defendant falsely testified that he could not obtain information about his 2005 income because he was prohibited from speaking with BCI. *Id.* at 43. On direct examination, defendant falsely testified that he could not get accurate information about his 2005 income because he believed that the Court barred him from speaking to anyone at BCI. *Id.* at 43-44. Again, defendant's false testimony on direct examination was meant to convey the false impression that defendant was precluded from obtaining accurate information regarding his 2005 income.

On cross examination, defendant conceded, however, that approximately two years elapsed between the time he left BCI and the Court imposing bond conditions that limited his ability to communicate with BCI. *Id.* at 82. Thus, defendant had ample time to get corrected income information from BCI.

Further, as evidenced by the emails attached hereto as Government Exhibit 2, after defendant purportedly left BCI but before he was placed on bond, he was in contact with Hollnagel. Thus, contrary to defendant's claim, he could have pressed BCI for revised income information after he purportedly stopped working at BCI. Defendant merely chose not to do so.

13

### 3. Defendant Testified Falsely Regarding His 2003 Tax Return.

As described above, defendant's testimony regarding his 2003 tax return was incredible. For instance, part of defendant's story regarding his 2003 tax return hinges on his false testimony that he mistakenly believed that his payment for his 2003 taxes actually was for his 2004 taxes. Moreover, defendant's story regarding his 2003 tax return requires one to believe that defendant provided BCI's controller with his tax information and a blank check and never again asked a question about the tax return. As set forth above, that testimony simply cannot be believed.

### D. Defendant Has not Accepted Responsibility.

Defendant contends that this Court should reduce his offense level by 2 levels for acceptance of responsibility, pursuant to Guideline § 3E1.1(a). Position Paper at 5-6. Defendant has not accepted responsibility. As described above, defendant testified falsely at trial and continues to promote his false version of events in the Position Paper and Defendant's Version. While defendant claims to apologize for his conduct, in actuality, he does not. Defendant continues to claim that he acted negligently, as opposed to willfully – stating that he acknowledges that he did not do "what he should have done." Defendant's Version at 5. Further, defendant denies that he aided and assisted the preparation and presentation of a false and fraudulent return. Finally, defendant has not made any payments toward his outstanding tax obligations for the years 2003 through 2005. Defendant's claim that he is waiting to find out what he owes is disingenuous. Agent Ponzo set forth his tax calculations during the trial. If defendant truly accepted responsibility for his conduct and truly was sorry, defendant would have paid those obligations in full prior to sentencing or, at a minimum, made a good faith showing that he intended to pay the obligations.

While defendant claims that he has not paid his tax obligations because he may be entitled to deduct some expenses, the fact is that: (a) defendant was reimbursed for his expenses; and (b) has presented no evidence of any such claimed expenses. Even if defendant did have some deductible expenses, he still could have paid his tax obligations as set forth by Agent Ponzo. To the extent that defendant were to overpay his tax obligations, defendant could request a refund at a later date. Defendant's decision to make no payments based on his unsubstantiated claim of the possible existence of deductible expenses is inconsistent with acceptance of responsibility.

### IV.    18 U.S.C. § 3553(a)

**A.    This Court Should Impose a Sentence of 24 Months' Imprisonment.**

**1.    The Guidelines and § 3553(a).**

Post-*Booker v. United States*, 543 U.S. 220 (2005), 18 U.S.C. § 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[2] In order to determine the "particular" sentence to impose, the court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Guidelines, and another is the Commission's policy statements. § 3553(a)(4), (a)(5). Although the Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial

---

2Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

benchmark." *Gall v. United States*, 128 S. Ct. 586, 598 (2007). For two reasons, this court should give serious consideration to the advisory Guidelines range.

First, the Guidelines are the *sole* factor in § 3553(a) that provide any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, § 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker*, 543 U.S. at 250, 253, 267. Second, the Guidelines generally deserve serious consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 128 S. Ct. at 594. The Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, 28 U.S.C. § 994(o), and these ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

Here, the maximum sentence this Court can impose is below the low-end of the advisory Guidelines range. In this case, this Court should impose the maximum sentence allowable in order to effectuate, as closely as possible, the goals promoted by the Guidelines.

2.    **18 U.S.C. § 3553(a)(1) – Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

Pursuant to 18 U.S.C. § 3553 (a), there are a number of factors for the Court to consider when determining the appropriate sentence. First, the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The government has set forth the nature and circumstances of defendant's offense

and relevant conduct throughout and does not repeat it here. In short, defendant engaged in a concerted effort to cheat the United States out of defendant's substantial tax obligations.

With respect to defendant's history and characteristics, defendant is an attorney who was licensed to practice law in Illinois during hte time he was committing the tax crimes at issue here. Dkt. No. 112 at 68-69. Further, defendant's tax obligations were not the only obligations defendant chose to ignore. As established at trial, and as set forth in the PSR, defendant failed to pay-off his student loan obligations, resulting in a judgment against defendant. *Id.* at 100-01; PSR at 15:395-96. Notably, at the same time that defendant had large tax and loan obligations, , he lived a life of luxury, which included living in a $1.3 million home, driving a Mercedes Benz and Harley Davidson and having a full-time nanny. *Id.* at 75, 101-04, 106-09; PSR at 9:217-19, 14:381-82; 15:385-86.

At trial, it also became clear that defendant was a dishonest person.[3] As described above, defendant testified falsely about a number of material topics. Further, defendant testified about the way in which he and his wife were able to obtain the mortgages on their $1.3 million home. Dkt. No. 12 at 101-04, 106-09. Specifically, defendant testified that because of his bad credit, he was not able to obtain a mortgage in his name. *Id.* Defendant testified that as a result, his wife falsely represented on the mortgage applications that she made $30,000 per month when, in fact, she did not. *Id.* Defendant admitted that he was present when the application was being prepared.

---

3 In the Position Paper, defendant contends that all of the information he provided to the government during interviews was truthful. Position Paper at 5. That contention is false. Because defendant's interviews were done pursuant to a proffer agreement, the government does not describe the details of the proffer interviews.

It is significant to note that defendant had the means to pay his tax obligations at the time they were due and subsequent to that. Defendant has simply chosen not to do so. As established at trial, during the three years at issue, defendant earned a combined total of over $600,000. Despite owing over $200,000 in taxes for those three years, defendant merely paid a little more than $20,000. Moreover, since 2005, defendant has continued to earn a six figure income. PSR at 11:278-300. Yet, defendant still has not paid his tax obligations for the years 2003 through 2005.

### 3.    18 U.S.C. § 3553 (a)(2) – Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence

Section 3553 also directs the Court to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct. These factors are of particular concern because defendant's offense conduct and relevant conduct are easy to commit and without proper punishment, the potential benefits may seem to outweigh any potential downside.

As set forth above, defendant's offense and relevant conduct are serious and egregious. The United States relies on each citizen to pay his share of the tax burden. Unfortunately, defendant, and many others like him, believe that they can take what the United States has to offer without paying for it. In defendant's case, this conduct is particularly egregious because defendant had the funds to pay his share of the tax burden but chose to spend it on discretionary items such as a $1.3 million home and other material items such as a Mercedes Benz.

It is now time for defendant to face the consequences of his free ride. A sentence of 24 months' imprisonment is the appropriate consequence. Significantly, such a sentence will not only properly punish and deter defendant but it will also deter others who would possibly

consider committing similar crimes. Tax crimes are relatively easy to commit and hard to prevent. Deterrence is a key tool in preventing economic crimes. A within-Guideline sentence is likely to promote deterrence. On the flip side, the non-custodial sentence sought by defendant will send the message that tax crimes are not taken seriously and convince defendant and others that tax obligations are optional and do not result in any significant punishment.

Finally, defendant's actions in both ignoring his tax obligations and testifying falsely demonstrate defendant's lack of respect for the law and the judicial system. Given that lack of respect, it is likely that defendant would view a non-custodial sentence as somehow demonstrating that he was victorious in this prosecution against him and embolden him to continue committing similar crimes. Moreover, others who are aware of defendant's criminal conduct will lose respect for the law, knowing that a lawyer can commit federal crimes and perjure himself, only to get a non-custodial sentence. To avoid such a result, this Court should impose a meaningful sentence of 24 months' imprisonment.

### 4. 18 U.S.C. § 3553 (a) (6) - Avoid Unwarranted Sentencing Disparities

Finally, § 3553 directs the Court to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Imposing the maximum sentence allowed by law (which is below the low-end of the Guideline range) will avoid unwarranted sentencing disparities.

19

## V.   <u>CONCLUSION</u>

This Court should determine defendant's offense level to be 20, and his criminal history

category to be I.  Accordingly, defendant's Guideline range is 33 to 41 months' imprisonment.

The maximum sentence this Court can impose in this case is 24 months' imprisonment.  Based

on the factors set forth in § 3553(a), a sentence of 24 months' imprisonment is the proper

sentence in this case.

Dated: September 8, 2010

<div style="margin-left: 40%;">

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By:   /s/ Scott R. Drury
     SCOTT R. DRURY
     KENNETH E. YEADON
     Assistant United States Attorneys
     219 South Dearborn Street
     Chicago, Illinois 60604
     (312) 353-1416

</div>

# GOVERNMENT EXHIBIT 1

**Christopher Keller**
**Computation of Tax Due and Owing**
**For the Years 2003 through 2005**



GOVERNMENT EXHIBIT

|  | 2003 | 2004 | 2005 | Government Exhibit |
|---|---|---|---|---|
| Unreported BCI Income | 62,499 | 168,700 | 370,896 | Summary 1, 2, 3 |
| Dividends | - | 5 | 19 | Tax 16, 19, 22 |
| Capital Gain or (Loss) | - | (1,500) | (1,500) | Tax 2 |
| Standard Deduction | - | (4,850) | (5,000) | |
| Exemption | - | (496) | - | |
| One Half Self-Employment Tax Deduction Adjustment | (2,024) | (7,709) | (10,547) | |
| Total Adjustments to Taxable Income | 60,475 | 154,150 | 353,868 | |
| Plus: Taxable Income Per Return | 115,511 | - | - | Tax 2, 21, 24 |
| Corrected Taxable Income | 175,986 | 154,150 | 353,868 | |
| Filing Status | Married Filing Jointly | Married Filing Separately | Married Filing Separately | Tax 2, 32, 33 |
| Tax on Corrected Taxable Income | 39,521 | 41,382 | 110,885 | |
| Plus: Self Employment Tax | 14,430 | 15,418 | 21,093 | |
| Total Corrected Tax Liability | 53,951 | 56,800 | 131,978 | |
| Less: Total Tax Shown on Return | (32,906) | - | - | Tax 2, 21, 24 |
| Tax Due and Owing | 21,045 | 56,800 | 131,978 | |

# Total Tax Due and Owing 2003 - 2005: $ 209,823

# GOVERNMENT EXHIBIT 2

**From:** Brian Hollnagel
**Sent:** Wednesday, February 28, 2007 3:07 PM
**To:** Chris Keller
**Subject:** RE: records on 378

Thanks Chris, we'll see you then.

---

**From:** Chris Keller
**Sent:** Wednesday, February 28, 2007 12:30 PM
**To:** Brian Hollnagel
**Subject:** RE: records on 378

Brian,

I am having GA Telesis track the package that was sent out. I do not have them. Seva inspected them and I find it hard to believe that the records are not in CA. I will be in the office tomorrow and will search for them.

See you tomorrow.

---

Christopher Keller
Executive Vice President

BCI Aircraft Leasing, Inc.
1 IBM Plaza
330 N. Wabash
Suite 2802
Chicago, Illinois 60611
office: 312.329.1700
direct: 312.329.1231
fax: 312.329.1250

---

**From:** Brian Hollnagel
**Sent:** Tue 2/27/2007 8:25 PM
**To:** Chris Keller
**Subject:** records on 378

Chris, do you know where the records are for this aircraft, people are saying that they were sent to you? I am finding this somewhat hard to believe, unless you took them home. Abdoi says he sent them out. Any ideas where they were put?

Thanks,

Brian

1



GOVERNMENT EXHIBIT

EMAIL2-BCI000001

RPRT-BCI003804

**From:**         Chris Keller
**Sent:**         Tuesday, March 06, 2007 12:19 PM
**To:**            Brian Hollnagel
**Subject:**      RE: B737-200 MSN 21002

The amount was $40,000 and the wire should have come in around the end of September or early October.

---

**From:** Brian Hollnagel
**Sent:** Tuesday, March 06, 2007 12:35 PM
**To:** Chris Keller
**Subject:** RE: B737-200 MSN 21002

Where was it from, from whom and for what amount. I will go back to him and have him search, it will be easier with an amount and point of origin.

Thanks,
Brian

---

**From:** Chris Keller
**Sent:** Tue 3/6/2007 12:29 PM
**To:** Brian Hollnagel
**Subject:** RE: B737-200 MSN 21002

Brian,

Mike needs to look again. We received this money while Dean was still here and it was coded as such.

Receipt was confirmed.

Chris

---

**From:** Brian Hollnagel
**Sent:** Tuesday, March 06, 2007 12:18 PM
**To:** Chris Keller
**Subject:** FW: B737-200 MSN 21002

Chris, what do you know about this, I have had Mike Sampat search on this and we have receved nothing.

---

**From:** Fortunato Peralta
**Sent:** Tue 3/6/2007 10:39 AM
**To:** Brian Hollnagel; Chris Keller; Chris Keller
**Cc:** kelleresq@a
**Subject:** RE: B737-200 MSN 21002

Dear Brian,

1

EMAIL2-BCI000002

RPRT-BCI003806

I am very surprised with your below message. I will collect in the next few hours all the information I have in my computer about this deal, to send it to you.
The airframe has been paid to a BCI account.
For the two engines we are offering 140K
Please talk with Chris about this deal he knows all the details. Also your lawyers in Perú. Maybe you forgot about this deal because of all the work you must have in your hands.


Regards,

Fortunato

---

**From:** Brian Hollnagel [mailto:  ]
**Sent:** Monday, March 05, 2007 11:21 PM
**To:** fortis@      ; Chris Keller; Chris Keller
**Cc:** lpt@fortis
**Subject:** RE: B737-200 MSN 21002

Fortunato, How much are you offering on the engines? How much have you paid on the airframe, and when did you make this payment? We don't have any record of this.

Thanks

Brian

---

**From:** Fortunato Peralta [mailto:                ]
**Sent:** Mon 3/5/2007 4:22 PM
**To:** Chris Keller; Chris Keller
**Cc:** Brian Hollnagel; lpt@fortis-corp.com
**Subject:** B737-200 MSN 21002


Dear Chris,

We still have not received back the contract of the airframe, even though you have received already the payment.

About the engines. Please tell me what we have to do to buy them. We are waiting to receive the clearance of the title. Maybe we can put the money in escrow and let the escrow company clean the title once you reach a settlement with Samy from New Jet. Please advice.


Regards,
*Fortunato Peralta*

**FORTIS CORP.**

**Phone:** ▬▬▬▬

2

EMAIL2-BCI000003

RPRT-BCI003807

**Nextel** ▮████████

**fAX:** ████████

**Internet Instant Messaging:** *MSN Messenger*
████████

**Skype:** *fortiscorp*

**e-mail:** fortis@fortis-corp.com

**Website:** www.fortis-corp.com

**Legal Notice:** *This email is confidential, may be legally privileged and is for the intended recipient only. This e-mail text (and all other e-mails from this sender) and any files transmitted with it, are confidential and intended solely for the use of the addressee. The content of this e-mail may not be changed without the consent of the originator. The information supplied must be viewed in this context. If you have received this e-mail in error please notify the sender. Any use, dissemination, forwarding, printing, or copying of this e-mail or its attachments is strictly prohibited.*

EMAIL2-BCI000004

RPRT-BCI003808